# GENTILE *v.* STATE BAR OF NEVADA

No. 89–1836. Argued April 15, 1991—Decided June 27, 1991

*Michael E. Tigar* argued the cause for petitioner. With him on the briefs were *Samuel J. Buffone, Terrance G. Reed,* and *Neil G. Galatz.*

*Robert H. Klonoff* argued the cause for respondent. With him on the brief were *Donald B. Ayer* and *John E. Howe.**

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts III and VI, and an opinion with respect to Parts I, II, IV, and V, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Leon Friedman, Steven R. Shapiro, John A. Powell,* and *Elliot Mincberg;* and for the American Newspaper Publishers Association et al. by *Alice Neff Lucan, Harold W. Fuson, Jr., Jane E. Kirtley, David M. Olive, Deborah R. Linfield, W. Terry Maguire, René P. Milam, Bruce W. Sanford, J. Laurent Scharff, Richard M. Schmidt, Jr.,* and *Barbara Wartelle Wall.*

*Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Stephen J. Marzen* filed a brief for the United States as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the American Bar Association by *John J. Curtin, Jr.,* and *George A. Kuhlman;* for the National Association of Criminal Defense Lawyers by *William J. Genego;* and for Nevada Attorneys for Criminal Justice by *Kevin M. Kelly.*

Hours after his client was indicted on criminal charges, petitioner Gentile, who is a member of the Bar of the State of Nevada, held a press conference. He made a prepared statement, which we set forth in Appendix A to this opinion, and then he responded to questions. We refer to most of those questions and responses in the course of our opinion.

Some six months later, the criminal case was tried to a jury and the client was acquitted on all counts. The State Bar of Nevada then filed a complaint against petitioner, alleging a violation of Nevada Supreme Court Rule 177, a rule governing pretrial publicity almost identical to ABA Model Rule of Professional Conduct 3.6. We set forth the full text of Rule 177 in Appendix B. Rule 177(1) prohibits an attorney from making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." Rule 177(2) lists a number of statements that are "ordinarily . . . likely" to result in material prejudice. Rule 177(3) provides a safe harbor for the attorney, listing a number of statements that can be made without fear of discipline notwithstanding the other parts of the Rule.

Following a hearing, the Southern Nevada Disciplinary Board of the State Bar found that Gentile had made the statements in question and concluded that he violated Rule 177. The board recommended a private reprimand. Petitioner appealed to the Nevada Supreme Court, waiving the confidentiality of the disciplinary proceeding, and the Nevada court affirmed the decision of the board.

Nevada's application of Rule 177 in this case violates the First Amendment. Petitioner spoke at a time and in a manner that neither in law nor in fact created any threat of real prejudice to his client's right to a fair trial or to the State's interest in the enforcement of its criminal laws. Furthermore, the Rule's safe harbor provision, Rule 177(3), appears

to permit the speech in question, and Nevada's decision to discipline petitioner in spite of that provision raises concerns of vagueness and selective enforcement.

## I

The matter before us does not call into question the constitutionality of other States' prohibitions upon an attorney's speech that will have a "substantial likelihood of materially prejudicing an adjudicative proceeding," but is limited to Nevada's interpretation of that standard. On the other hand, one central point must dominate the analysis: this case involves classic political speech. The State Bar of Nevada reprimanded petitioner for his assertion, supported by a brief sketch of his client's defense, that the State sought the indictment and conviction of an innocent man as a "scapegoat" and had not "been honest enough to indict the people who did it; the police department, crooked cops." See *infra*, Appendix A. At issue here is the constitutionality of a ban on political speech critical of the government and its officials.

## A

Unlike other First Amendment cases this Term in which speech is not the direct target of the regulation or statute in question, see, *e. g., Barnes* v. *Glen Theatre, Inc., ante,* p. 560 (ban on nude barroom dancing); *Leathers* v. *Medlock,* 499 U. S. 439 (1991) (sales tax on cable and satellite television), this case involves punishment of pure speech in the political forum. Petitioner engaged not in solicitation of clients or advertising for his practice, as in our precedents from which some of our colleagues would discern a standard of diminished First Amendment protection. His words were directed at public officials and their conduct in office.

There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment. Nevada seeks to punish the dissemination of informa-

tion relating to alleged governmental misconduct, which only last Term we described as "speech which has traditionally been recognized as lying at the core of the First Amendment." *Butterworth* v. *Smith*, 494 U. S. 624, 632 (1990).

The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. See, *e. g.*, *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 838–839 (1978). "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 575 (1980). Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. . . . Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U. S. 257, 270–271 (1948). As we said in *Bridges* v. *California*, 314 U. S. 252 (1941), limits upon public comment about pending cases are

"likely to fall not only at a crucial time but upon the most important topics of discussion. . . .

"No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." *Id.*, at 268–269.

In *Sheppard* v. *Maxwell*, 384 U. S. 333, 350 (1966), we reminded that "[t]he press . . . guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."

Public awareness and criticism have even greater importance where, as here, they concern allegations of police corruption, see *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 606 (1976) (Brennan, J., concurring in judgment) ("[C]ommen-

tary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern"), or where, as is also the present circumstance, the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process, see *Morrison* v. *Olson*, 487 U. S. 654, 727–728 (1988) (SCALIA, J., dissenting). The public has an interest in its responsible exercise.

### B

We are not called upon to determine the constitutionality of the ABA Model Rule of Professional Conduct 3.6 (1981), but only Rule 177 as it has been interpreted and applied by the State of Nevada. Model Rule 3.6's requirement of substantial likelihood of material prejudice is not necessarily flawed. Interpreted in a proper and narrow manner, for instance, to prevent an attorney of record from releasing information of grave prejudice on the eve of jury selection, the phrase substantial likelihood of material prejudice might punish only speech that creates a danger of imminent and substantial harm. A rule governing speech, even speech entitled to full constitutional protection, need not use the words "clear and present danger" in order to pass constitutional muster.

> "Mr. Justice Holmes' test was never intended 'to express a technical legal doctrine or to convey a formula for adjudicating cases.' *Pennekamp* v. *Florida*, 328 U. S. 331, 353 (1946) (Frankfurter, J., concurring). Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed." *Landmark Communications, Inc.* v. *Virginia, supra,* at 842–843.

The drafters· of Model Rule 3.6 apparently thought the substantial likelihood of material prejudice formulation approximated the clear and present danger test. See ABA Annotated Model Rules of Professional Conduct 243 (1984) ("formulation in Model Rule 3.6 incorporates a standard approximating clear and present danger by focusing on the likelihood of injury and its substantiality"; citing *Landmark Communications, supra,* at 844; *Wood* v. *Georgia,* 370 U. S. 375 (1962); and *Bridges* v. *California, supra,* at 273, for guidance in determining whether statement "poses a sufficiently serious and imminent threat to the fair administration of justice"); G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct 397 (1985) ("To use traditional terminology, the danger of prejudice to a proceeding must be both clear (material) and present (substantially likely)"); *In re Hinds,* 90 N. J. 604, 622, 449 A. 2d 483, 493 (1982) (substantial likelihood of material prejudice standard is a linguistic equivalent of clear and present danger).

The difference between the requirement of serious and imminent threat found in the disciplinary rules of some States and the more common formulation of substantial likelihood of material prejudice could prove mere semantics. Each standard requires an assessment of proximity and degree of harm. Each may be capable of valid application. Under those principles, nothing inherent in Nevada's formulation fails First Amendment review; but as this case demonstrates, Rule 177 has not been interpreted in conformance with those principles by the Nevada Supreme Court.

## II

Even if one were to accept respondent's argument that lawyers participating in judicial proceedings may be subjected, consistent with the First Amendment, to speech restrictions that could not be imposed on the press or general public, the judgment should not be upheld. The record does

not support the conclusion that petitioner knew or reasonably should have known his remarks created a substantial likelihood of material prejudice, if the Rule's terms are given any meaningful content.

We have held that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 499 (1984) (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 284–286 (1964)).

Neither the disciplinary board nor the reviewing court explains any sense in which petitioner's statements had a substantial likelihood of causing material prejudice. The only evidence against Gentile was the videotape of his statements and his own testimony at the disciplinary hearing. The Bar's whole case rests on the fact of the statements, the time they were made, and petitioner's own justifications. Full deference to these factual findings does not justify abdication of our responsibility to determine whether petitioner's statements can be punished consistent with First Amendment standards.

Rather, this Court is

> "compelled to examine for [itself] the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Pennekamp* v. *Florida*, 328 U. S. 331, 335 (1946).

> "'Whenever the fundamental rights of free speech . . . are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually

did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature.'" *Landmark Communications, Inc.* v. *Virginia,* 435 U. S., at 844 (quoting *Whitney* v. *California,* 274 U. S. 357, 378–379 (1927) (Brandeis, J., concurring)).

Whether one applies the standard set out in *Landmark Communications* or the lower standard our colleagues find permissible, an examination of the record reveals no basis for the Nevada court's conclusion that the speech presented a substantial likelihood of material prejudice.

Our decision earlier this Term in *Mu'Min* v. *Virginia,* 500 U. S. 415 (1991), provides a pointed contrast to respondent's contention in this case. There, the community had been subjected to a barrage of publicity prior to Mu'Min's trial for capital murder. News stories appeared over a course of several months and included, in addition to details of the crime itself, numerous items of prejudicial information inadmissible at trial. Eight of the twelve individuals seated on Mu'Min's jury admitted some exposure to pretrial publicity. We held that the publicity did not rise even to a level requiring questioning of individual jurors about the content of publicity. In light of that holding, the Nevada court's conclusion that petitioner's abbreviated, general comments six months before trial created a "substantial likelihood of materially prejudicing" the proceeding is, to say the least, most unconvincing.

### A

*Pre-Indictment Publicity.* On January 31, 1987, undercover police officers with the Las Vegas Metropolitan Police Department (Metro) reported large amounts of cocaine (four kilograms) and travelers' checks (almost $300,000) missing from a safety deposit vault at Western Vault Corporation. The drugs and money had been used as part of an undercover

operation conducted by Metro's Intelligence Bureau. Petitioner's client, Grady Sanders, owned Western Vault. John Moran, the Las Vegas sheriff, reported the theft at a press conference on February 2, 1987, naming the police and Western Vault employees as suspects.

Although two police officers, Detective Steve Scholl and Sargeant Ed Schaub, enjoyed free access to the deposit box throughout the period of the theft, and no log reported comings and goings at the vault, a series of press reports over the following year indicated that investigators did not consider these officers responsible. Instead, investigators focused upon Western Vault and its owner. Newspaper reports quoted the sheriff and other high police officials as saying that they had not lost confidence in the "elite" Intelligence Bureau. From the beginning, Sheriff Moran had "complete faith and trust" in his officers. App. 85.

The media reported that, following announcement of the cocaine theft, others with deposit boxes at Western Vault had come forward to claim missing items. One man claimed the theft of his life savings of $90,000. *Id.*, at 89. Western Vault suffered heavy losses as customers terminated their box rentals, and the company soon went out of business. The police opened other boxes in search of the missing items, and it was reported they seized $264,900 in United States currency from a box listed as unrented.

Initial press reports stated that Sanders and Western Vault were being cooperative; but as time went on, the press noted that the police investigation had failed to identify the culprit and through a process of elimination was beginning to point toward Sanders. Reports quoted the affidavit of a detective that the theft was part of an effort to discredit the undercover operation and that business records suggested the existence of a business relation between Sanders and the targets of a Metro undercover probe. *Id.*, at 85.

The deputy police chief announced the two detectives with access to the vault had been "cleared" as possible suspects.

According to an unnamed "source close to the investigation," the police shifted from the idea that the thief had planned to discredit the undercover operation to the theory that the thief had unwittingly stolen from the police. The stories noted that Sanders "could not be reached for comment." *Id.*, at 93.

The story took a more sensational turn with reports that the two police suspects had been cleared by police investigators after passing lie detector tests. The tests were administered by one Ray Slaughter. But later, the Federal Bureau of Investigation (FBI) arrested Slaughter for distributing cocaine to an FBI informant, Belinda Antal. It was also reported that the $264,900 seized from the unrented safety deposit box at Western Vault had been stored there in a suitcase owned by one Tammy Sue Markham. Markham was "facing a number of federal drug-related charges" in Tucson, Arizona. Markham reported items missing from three boxes she rented at Western Vault, as did one Beatrice Connick, who, according to press reports, was a Columbian national living in San Diego and "not facing any drug related charges." (As it turned out, petitioner impeached Connick's credibility at trial with the existence of a money laundering conviction.) Connick also was reported to have taken and passed a lie detector test to substantiate her charges. *Id.*, at 94–97. Finally, press reports indicated that Sanders had refused to take a police polygraph examination. *Id.*, at 41. The press suggested that the FBI suspected Metro officers were responsible for the theft, and reported that the theft had severely damaged relations between the FBI and Metro.

## B

*The Press Conference.* Petitioner is a Las Vegas criminal defense attorney, an author of articles about criminal law and procedure, and a former associate dean of the National College for Criminal Defense Lawyers and Public Defenders. *Id.*, at 36–38. Through leaks from the police department, he

had some advance notice of the date an indictment would be returned and the nature of the charges against Sanders. Petitioner had monitored the publicity surrounding the case, and, prior to the indictment, was personally aware of at least 17 articles in the major local newspapers, the Las Vegas Sun and Las Vegas Review-Journal, and numerous local television news stories which reported on the Western Vault theft and ensuing investigation. *Id.*, at 38–39; see Respondent's Exhibit A, before Disciplinary Board. Petitioner determined, for the first time in his career, that he would call a formal press conference. He did not blunder into a press conference, but acted with considerable deliberation.

### 1

*Petitioner's Motivation.* As petitioner explained to the disciplinary board, his primary motivation was the concern that, unless some of the weaknesses in the State's case were made public, a potential jury venire would be poisoned by repetition in the press of information being released by the police and prosecutors, in particular the repeated press reports about polygraph tests and the fact that the two police officers were no longer suspects. App. 40–42. Respondent distorts Rule 177 when it suggests this explanation admits a purpose to prejudice the venire and so proves a violation of the Rule. Rule 177 only prohibits the dissemination of information that one knows or reasonably should know has a "substantial likelihood of materially prejudicing an adjudicative proceeding." Petitioner did not indicate he thought he could sway the pool of potential jurors to form an opinion in advance of the trial, nor did he seek to discuss evidence that would be inadmissible at trial. He sought only to counter publicity already deemed prejudicial. The Southern Nevada Disciplinary Board so found. It said petitioner attempted

"(i) to counter public opinion which he perceived as adverse to Mr. Sanders, (ii) . . . to refute certain matters regarding his client which had appeared in the media, (iii) to fight back against the perceived efforts of the prosecution to poison the prospective juror pool, and (iv) to publicly present Sanders' side of the case." App. 3–4.

Far from an admission that he sought to "materially prejudic[e] an adjudicative proceeding," petitioner sought only to stop a wave of publicity he perceived as prejudicing potential jurors against his client and injuring his client's reputation in the community.

Petitioner gave a second reason for holding the press conference, which demonstrates the additional value of his speech. Petitioner acted in part because the investigation had taken a serious toll on his client. Sanders was "not a man in good health," having suffered multiple open-heart surgeries prior to these events. *Id.*, at 41. And prior to indictment, the mere suspicion of wrongdoing had caused the closure of Western Vault and the loss of Sanders' ground lease on an Atlantic City, New Jersey, property. *Ibid.*

An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client. Just as an attorney may recommend a plea bargain or civil settlement to avoid the adverse consequences of a possible loss after trial, so too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives. A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.

2

*Petitioner's Investigation of Rule 177.* Rule 177 is phrased in terms of what an attorney "knows or reasonably should know." On the evening before the press conference, petitioner and two colleagues spent several hours researching the extent of an attorney's obligations under Rule 177. He decided, as we have held, see *Patton* v. *Yount,* 467 U. S. 1025 (1984), that the timing of a statement was crucial in the assessment of possible prejudice and the Rule's application, accord, *Stroble* v. *California,* 343 U. S. 181, 191–194 (1952). App. 44.

Upon return of the indictment, the court set a trial date for August 1988, some six months in the future. Petitioner knew, at the time of his statement, that a jury would not be empaneled for six months at the earliest, if ever. He recalled reported cases finding no prejudice resulting from juror exposure to "far worse" information two and four months before trial, and concluded that his proposed statement was not substantially likely to result in material prejudice. *Ibid.*

A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing an impartial jury, and at the very least could complicate the jury selection process. See ABA Annotated Model Rules of Professional Conduct 243 (1984) (timing of statement a significant factor in determining seriousness and imminence of threat). As turned out to be the case here, exposure to the same statement six months prior to trial would not result in prejudice, the content fading from memory long before the trial date.

In 1988, Clark County, Nevada, had population in excess of 600,000 persons. Given the size of the community from which any potential jury venire would be drawn and the length of time before trial, only the most damaging of information could give rise to any likelihood of prejudice. The innocuous content of petitioner's statements reinforces my conclusion.

## 3

*The Content of Petitioner's Statements.* Petitioner was disciplined for statements to the effect that (1) the evidence demonstrated his client's innocence, (2) the likely thief was a police detective, Steve Scholl, and (3) the other victims were not credible, as most were drug dealers or convicted money launderers, all but one of whom had only accused Sanders in response to police pressure, in the process of "trying to work themselves out of something." Appendix A, *infra,* at 1059. App. 2–3 (Findings and Recommendation of the State Bar of Nevada, Southern Nevada Disciplinary Board). He also strongly implied that Steve Scholl could be observed in a videotape suffering from symptoms of cocaine use. Of course, only a small fraction of petitioner's remarks were disseminated to the public, in two newspaper stories and two television news broadcasts.

The stories mentioned not only Gentile's press conference but also a prosecution response and police press conference. See App. 127–129, 131–132; Respondent's Exhibit A, before Disciplinary Board.[1] The chief deputy district attorney was

---

[1] The sole summary of television reports of the press conference contained in the record is as follows:

"2–5–88:

"GENTILE NEWS CONFERENCE STORY. GENTILE COMPARES THE W. VAULT BURGLARY TO THE FRENCH CONNECTION CASE IN WHICH THE BAD GUYS WERE COPS. GENTILE SAYS THE EVIDENCE IS CIRCUMSTANTIAL AND THAT THE COPS SEEM THE MORE LIKELY CULPRITS, THAT DET. SCHOLL HAS SHOWN SIGNS OF DRUG USE, THAT THE OTHER CUSTOMERS WERE PRESSURED INTO COMPLAINING BY METRO, THAT THOSE CUSTOMERS ARE KNOWN DRUG DEALERS, AND THAT OTHER AGENCIES HAVE OPERATED OUT OF W. VAULT WITHOUT HAVING SIMILAR PROBLEMS.

"2–5–88: *METRO NEWS CONFERENCE IN WHICH CHIEF SULLIVAN EXPLAINS THAT THE OFFICERS INVOLVED HAVE BEEN CLEARED BY POLYGRAPH TESTS.* STORY MENTIONS THAT THE POLYGRAPHER WAS RAY SLAUGHTER, UNUSUAL BECAUSE SLAUGHTER IS A PRIVATE EXAMINER, NOT A METRO EXAMINER. REPORTER DETAILS SLAUGHTER'S BACK-

quoted as saying that this was a legitimate indictment, and that prosecutors cannot bring an indictment to court unless they can prove the charges in it beyond a reasonable doubt. App. 128–129. Deputy Police Chief Sullivan stated for the police department: "'We in Metro are very satisfied our officers (Scholl and Sgt. Ed Schaub) had nothing to do with this theft or any other. They are both above reproach. Both are veteran police officers who are dedicated to honest law enforcement.'" *Id.*, at 129. In the context of general public awareness, these police and prosecution statements were no more likely to result in prejudice than were petitioner's statements, but given the repetitive publicity from the police investigation, it is difficult to come to any conclusion but that the balance remained in favor of the prosecution.

Much of the information provided by petitioner had been published in one form or another, obviating any potential for prejudice. See ABA Annotated Model Rules of Professional Conduct 243 (1984) (extent to which information already circulated significant factor in determining likelihood of prejudice). The remainder, and details petitioner refused to provide, were available to any journalist willing to do a little bit of investigative work.

Petitioner's statements lack any of the more obvious bases for a finding of prejudice. Unlike the police, he refused to comment on polygraph tests except to confirm earlier reports that Sanders had not submitted to the police polygraph; he mentioned no confessions and no evidence from searches or test results; he refused to elaborate upon his charge that the other so-called victims were not credible, except to explain his general theory that they were pressured to testify in an attempt to avoid drug-related legal trouble, and that some of

---

GROUND, INCLUDING HIS TEST OF JOHN MORAN REGARDING SPILOTRO CONTRIBUTIONS. ALSO MENTIONS SLAUGHTER'S DRUG BUST, SPECULATES ABOUT WHETHER IT WAS A SETUP BY THE FBI. QUOTES GENTILE AS SAYING THE TWO CASES ARE DEFINITELY RELATED." App. 131–132 (emphasis added).

them may have asserted claims in an attempt to collect insurance money.

## C

*Events Following the Press Conference.* Petitioner's judgment that no likelihood of material prejudice would result from his comments was vindicated by events at trial. While it is true that Rule 177's standard for controlling pretrial publicity must be judged at the time a statement is made, *ex post* evidence can have probative value in some cases. Here, where the Rule purports to demand, and the Constitution requires, consideration of the character of the harm and its heightened likelihood of occurrence, the record is altogether devoid of facts one would expect to follow upon any statement that created a real likelihood of material prejudice to a criminal jury trial.

The trial took place on schedule in August 1988, with no request by either party for a venue change or continuance. The jury was empaneled with no apparent difficulty. The trial judge questioned the jury venire about publicity. Although many had vague recollections of reports that cocaine stored at Western Vault had been stolen from a police undercover operation, and, as petitioner had feared, one remembered that the police had been cleared of suspicion, not a single juror indicated any recollection of petitioner or his press conference. App. 48–49; Respondent's Exhibit B, before Disciplinary Board.

At trial, all material information disseminated during petitioner's press conference was admitted in evidence before the jury, including information questioning the motives and credibility of supposed victims who testified against Sanders, and Detective Scholl's ingestion of drugs in the course of undercover operations (in order, he testified, to gain the confidence of suspects). App. 47. The jury acquitted petitioner's client, and, as petitioner explained before the disciplinary board,

> "when the trial was over with and the man was acquitted the next week the foreman of the jury phoned me and said to me that if they would have had a verdict form before them with respect to the guilt of Steve Scholl they would have found the man proven guilty beyond a reasonable doubt." *Id.*, at 47–48.

There is no support for the conclusion that petitioner's statements created a likelihood of material prejudice, or indeed of any harm of sufficient magnitude or imminence to support a punishment for speech.

## III

As interpreted by the Nevada Supreme Court, the Rule is void for vagueness, in any event, for its safe harbor provision, Rule 177(3), misled petitioner into thinking that he could give his press conference without fear of discipline. Rule 177(3)(a) provides that a lawyer "may state without elaboration . . . the general nature of the . . . defense." Statements under this provision are protected "[n]otwithstanding subsection 1 and 2 (a–f)." By necessary operation of the word "notwithstanding," the Rule contemplates that a lawyer describing the "general nature of the . . . defense" "without elaboration" need fear no discipline, even if he comments on "[t]he character, credibility, reputation or criminal record of a . . . witness," and even if he "knows or reasonably should know that [the statement] will have a substantial likelihood of materially prejudicing an adjudicative proceeding."

Given this grammatical structure, and absent any clarifying interpretation by the state court, the Rule fails to provide "'fair notice to those to whom [it] is directed.'" *Grayned* v. *City of Rockford*, 408 U. S. 104, 112 (1972). A lawyer seeking to avail himself of Rule 177(3)'s protection must guess at its contours. The right to explain the "general" nature of the defense without "elaboration" provides insufficient guidance because "general" and "elaboration" are both classic

terms of degree. In the context before us, these terms have no settled usage or tradition of interpretation in law. The lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated.

Petitioner testified he thought his statements were protected by Rule 177(3), App. 59. A review of the press conference supports that claim. He gave only a brief opening statement, see Appendix A, *infra*, at 1059–1060, and on numerous occasions declined to answer reporters' questions seeking more detailed comments. One illustrative exchange shows petitioner's attempt to obey the rule:

> "QUESTION FROM THE FLOOR: Dominick, you mention you question the credibility of some of the witnesses, some of the people named as victims in the government indictment.
>
> "Can we go through it and *elaborate* on their backgrounds, interests —
>
> "MR. GENTILE: *I can't because ethics prohibit me from doing so.*
>
> "Last night before I decided I was going to make a statement, I took a good close look at the rules of professional responsibility. There are things that I can say and there are things that I can't. Okay?
>
> "I can't name which of the people have the drug backgrounds. I'm sure you guys can find that by doing just a little bit of investigative work." App. to Pet. for Cert. 11a (emphasis added).[2]

---

[2] Other occasions are as follows:

"QUESTION FROM THE FLOOR: Do you believe any other police officers other than Scholl were involved in the disappearance of the dope and —

"MR. GENTILE: Let me say this: What I believe and what the proof is are two different things. Okay? I'm reluctant to discuss what I believe because I don't want to slander somebody, but I can tell you that the proof

Nevertheless, the disciplinary board said only that petitioner's comments "went beyond the scope of the statements permitted by SCR 177(3)," App. 5, and the Nevada Supreme

---

shows that Scholl is the guy that is most likely to have taken the cocaine and the American Express traveler's checks.

"QUESTION FROM THE FLOOR: What is that? What is that proof?

"MR. GENTILE: It'll come out; it'll come out." App. to Pet. for Cert. 9a.

"QUESTION FROM THE FLOOR: I have seen reports that the FBI seems to think sort of along the lines that you do.

"MR. GENTILE: Well, I couldn't agree with them more.

"QUESTION FROM THE FLOOR: Do you know anything about it?

"MR. GENTILE: Yes, I do; but again, Dan, I'm not in a position to be able to discuss that now.

"All I can tell you is that you're in for a very interesting six months to a year as this case develops." *Id.*, at 10a.

"QUESTION FROM THE FLOOR: Did the cops pass the polygraph?

"MR. GENTILE: Well, I would like to give you a comment on that, except that Ray Slaughter's trial is coming up and I don't want to get in the way of anybody being able to defend themselves.

"QUESTION FROM THE FLOOR: Do you think the Slaughter case— that there's a connection?

"MR. GENTILE: Absolutely. I don't think there is any question about it, and—

"QUESTION FROM THE FLOOR: What is that?

"MR. GENTILE: Well, it's intertwined to a great deal, I think.

"I know that what I think the connection is, again, is something I believe to be true. I can't point to it being true and until I can I'm not going to say anything.

"QUESTION FROM THE FLOOR: Do you think the police involved in this passed legitimate—legitimately passed lie detector tests?

"MR. GENTILE: I don't want to comment on that for two reasons:

"Number one, again, Ray Slaughter is coming up for trial and it wouldn't be right to call him a liar if I didn't think that it were true.

"But, secondly, I don't have much faith in polygraph tests.

"QUESTION FROM THE FLOOR: Did [Sanders] ever take one?

"MR. GENTILE: The police polygraph?

"QUESTION FROM THE FLOOR: Yes.

"MR. GENTILE: No, he didn't take a police polygraph.

"QUESTION FROM THE FLOOR: Did he take one with you?

"MR. GENTILE: I'm not going to disclose that now." *Id.*, at 12a–13a.

Court's rejection of petitioner's defense based on Rule 177(3) was just as terse, App. to Pet. for Cert. 4a. The fact that Gentile was found in violation of the Rules after studying them and making a conscious effort at compliance demonstrates that Rule 177 creates a trap for the wary as well as the unwary.

The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement, *Kolender* v. *Lawson*, 461 U. S. 352, 357–358, 361 (1983); *Smith* v. *Goguen*, 415 U. S. 566, 572–573 (1974), for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law. The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility. The inquiry is of particular relevance when one of the classes most affected by the regulation is the criminal defense bar, which has the professional mission to challenge actions of the State. Petitioner, for instance, succeeded in preventing the conviction of his client, and the speech in issue involved criticism of the government.

## IV

The analysis to this point resolves the case, and in the usual order of things the discussion should end here. Five Members of the Court, however, endorse an extended discussion which concludes that Nevada may interpret its requirement of substantial likelihood of material prejudice under a standard more deferential than is the usual rule where speech is concerned. It appears necessary, therefore, to set forth my objections to that conclusion and to the reasoning which underlies it.

Respondent argues that speech by an attorney is subject to greater regulation than speech by others, and restrictions on an attorney's speech should be assessed under a balancing test that weighs the State's interest in the regulation of a

specialized profession against the lawyer's First Amendment interest in the kind of speech that was at issue. The cases cited by our colleagues to support this balancing, *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977); *Peel* v. *Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U. S. 91 (1990); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978); and *Seattle Times Co.* v. *Rhinehart*, 467 U. S. 20 (1984), involved either commercial speech by attorneys or restrictions upon release of information that the attorney could gain only by use of the court's discovery process. Neither of those categories, nor the underlying interests which justified their creation, were implicated here. Petitioner was disciplined because he proclaimed to the community what he thought to be a misuse of the prosecutorial and police powers. Wide-open balancing of interests is not appropriate in this context.

## A

Respondent would justify a substantial limitation on speech by attorneys because "lawyers have special access to information, including confidential statements from clients and information obtained through pretrial discovery or plea negotiations," and so lawyers' statements "are likely to be received as especially authoritative." Brief for Respondent 22. Rule 177, however, does not reflect concern for the attorney's special access to client confidences, material gained through discovery, or other proprietary or confidential information. We have upheld restrictions upon the release of information gained "only by virtue of the trial court's discovery processes." *Seattle Times Co.* v. *Rhinehart, supra,* at 32. And *Seattle Times* would prohibit release of discovery information by the attorney as well as the client. Similar rules require an attorney to maintain client confidences. See, *e. g.*, ABA Model Rule of Professional Conduct 1.6 (1981).

This case involves no speech subject to a restriction under the rationale of *Seattle Times*. Much of the information in

petitioner's remarks was included by explicit reference or fair inference in earlier press reports. Petitioner could not have learned what he revealed at the press conference through the discovery process or other special access afforded to attorneys, for he spoke to the press on the day of indictment, at the outset of his formal participation in the criminal proceeding. We have before us no complaint from the prosecutors, police, or presiding judge that petitioner misused information to which he had special access. And there is no claim that petitioner revealed client confidences, which may be waived in any event. Rule 177, on its face and as applied here, is neither limited to nor even directed at preventing release of information received through court proceedings or special access afforded attorneys. Cf. *Butterworth* v. *Smith*, 494 U. S., at 632–634. It goes far beyond this.

## B

Respondent relies upon *obiter dicta* from *In re Sawyer*, 360 U. S. 622 (1959), *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), and *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976), for the proposition that an attorney's speech about ongoing proceedings must be subject to pervasive regulation in order to ensure the impartial adjudication of criminal proceedings. *In re Sawyer* involved general comments about Smith Act prosecutions rather than the particular proceeding in which the attorney was involved, conduct which we held not sanctionable under the applicable ABA Canon of Professional Ethics, quite apart from any resort to First Amendment principles. *Nebraska Press Assn.* considered a challenge to a court order barring the press from reporting matters most prejudicial to the defendant's Sixth Amendment trial right, not information released by defense counsel. In *Sheppard* v. *Maxwell*, we overturned a conviction after a trial that can only be described as a circus, with the courtroom taken over by the press and jurors turned into media stars. The prejudice to Dr. Sheppard's fair trial right can be traced in princi-

pal part to police and prosecutorial irresponsibility and the trial court's failure to control the proceedings and the courthouse environment. Each case suggests restrictions upon information release, but none confronted their permitted scope.

At the very least, our cases recognize that disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law. See, *e. g., In re Primus*, 436 U. S. 412 (1978); *Bates* v. *State Bar of Arizona, supra*. We have not in recent years accepted our colleagues' apparent theory that the practice of law brings with it comprehensive restrictions, or that we will defer to professional bodies when those restrictions impinge upon First Amendment freedoms. And none of the justifications put forward by respondent suffice to sanction abandonment of our normal First Amendment principles in the case of speech by an attorney regarding pending cases.

## V

Even if respondent is correct, and as in *Seattle Times* we must balance "whether the 'practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression' and whether 'the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved,'" *Seattle Times, supra*, at 32 (quoting *Procunier* v. *Martinez*, 416 U. S. 396, 413 (1974)), the Rule as interpreted by Nevada fails the searching inquiry required by those precedents.

## A

Only the occasional case presents a danger of prejudice from pretrial publicity. Empirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it

and base their verdict upon the evidence presented in court. See generally Simon, Does the Court's Decision in *Nebraska Press Association* Fit the Research Evidence on the Impact on Jurors of News Coverage?, 29 Stan. L. Rev. 515 (1977); Drechsel, An Alternative View of Media-Judiciary Relations: What the Non-Legal Evidence Suggests About the Fair Trial-Free Press Issue, 18 Hofstra L. Rev. 1 (1989). *Voir dire* can play an important role in reminding jurors to set aside out-of-court information and to decide the case upon the evidence presented at trial. All of these factors weigh in favor of affording an attorney's speech about ongoing proceedings our traditional First Amendment protections. Our colleagues' historical survey notwithstanding, respondent has not demonstrated any sufficient state interest in restricting the speech of attorneys to justify a lower standard of First Amendment scrutiny.

Still less justification exists for a lower standard of scrutiny here, as this speech involved not the prosecutor or police, but a criminal defense attorney. Respondent and its *amici* present not a single example where a defense attorney has managed by public statements to prejudice the prosecution of the State's case. Even discounting the obvious reason for a lack of appellate decisions on the topic—the difficulty of appealing a verdict of acquittal—the absence of anecdotal or survey evidence in a much-studied area of the law is remarkable.

The various bar association and advisory commission reports which resulted in promulgation of ABA Model Rule of Professional Conduct 3.6 (1981), and other regulations of attorney speech, and sources they cite, present no convincing case for restrictions upon the speech of defense attorneys. See Swift, Model Rule 3.6: An Unconstitutional Regulation of Defense Attorney Trial Publicity, 64 B. U. L. Rev. 1003, 1031–1049 (1984) (summarizing studies and concluding there is no empirical or anecdotal evidence of a need for restrictions on defense publicity); see also Drechsel, *supra*, at 35 ("[D]ata

showing the heavy reliance of journalists on law enforcement sources and prosecutors confirms the appropriateness of focusing attention on those sources when attempting to control pre-trial publicity"). The police, the prosecution, other government officials, and the community at large hold innumerable avenues for the dissemination of information adverse to a criminal defendant, many of which are not within the scope of Rule 177 or any other regulation. By contrast, a defendant cannot speak without fear of incriminating himself and prejudicing his defense, and most criminal defendants have insufficient means to retain a public relations team apart from defense counsel for the sole purpose of countering prosecution statements. These factors underscore my conclusion that blanket rules restricting speech of defense attorneys should not be accepted without careful First Amendment scrutiny.

## B

Respondent uses the "officer of the court" label to imply that attorney contact with the press somehow is inimical to the attorney's proper role. Rule 177 posits no such inconsistency between an attorney's role and discussions with the press. It permits all comment to the press absent "a substantial likelihood of materially prejudicing an adjudicative proceeding." Respondent does not articulate the principle that contact with the press cannot be reconciled with the attorney's role or explain how this might be so.

Because attorneys participate in the criminal justice system and are trained in its complexities, they hold unique qualifications as a source of information about pending cases. "Since lawyers are considered credible in regard to pending litigation in which they are engaged and are in one of the most knowledgeable positions, they are a crucial source of information and opinion." *Chicago Council of Lawyers* v. *Bauer*, 522 F. 2d 242, 250 (CA7 1975). To the extent the press and public rely upon attorneys for information because attorneys are well informed, this may prove the value to the

public of speech by members of the bar. If the dangers of their speech arise from its persuasiveness, from their ability to explain judicial proceedings, or from the likelihood the speech will be believed, these are not the sort of dangers that can validate restrictions. The First Amendment does not permit suppression of speech because of its power to command assent.

One may concede the proposition that an attorney's speech about pending cases may present dangers that could not arise from statements by a nonparticipant, and that an attorney's duty to cooperate in the judicial process may prevent him or her from taking actions with an intent to frustrate that process. The role of attorneys in the criminal justice system subjects them to fiduciary obligations to the court and the parties. An attorney's position may result in some added ability to obstruct the proceedings through well-timed statements to the press, though one can debate the extent of an attorney's ability to do so without violating other established duties. A court can require an attorney's cooperation to an extent not possible of nonparticipants. A proper weighing of dangers might consider the harm that occurs when speech about ongoing proceedings forces the court to take burdensome steps such as sequestration, continuance, or change of venue.

If as a regular matter speech by an attorney about pending cases raised real dangers of this kind, then a substantial governmental interest might support additional regulation of speech. But this case involves the sanction of speech so innocuous, and an application of Rule 177(3)'s safe harbor provision so begrudging, that it is difficult to determine the force these arguments would carry in a different setting. The instant case is a poor vehicle for defining with precision the outer limits under the Constitution of a court's ability to regulate an attorney's statements about ongoing adjudicative proceedings. At the very least, however, we can say that the Rule which punished petitioner's statements represents a limitation of First Amendment freedoms greater than is nec-

essary or essential to the protection of the particular governmental interest, and does not protect against a danger of the necessary gravity, imminence, or likelihood.

The vigorous advocacy we demand of the legal profession is accepted because it takes place under the neutral, dispassionate control of the judicial system. Though cost and delays undermine it in all too many cases, the American judicial trial remains one of the purest, most rational forums for the lawful determination of disputes. A profession which takes just pride in these traditions may consider them disserved if lawyers use their skills and insight to make untested allegations in the press instead of in the courtroom. But constraints of professional responsibility and societal disapproval will act as sufficient safeguards in most cases. And in some circumstances press comment is necessary to protect the rights of the client and prevent abuse of the courts. It cannot be said that petitioner's conduct demonstrated any real or specific threat to the legal process, and his statements have the full protection of the First Amendment.[3]

## VI

The judgment of the Supreme Court of Nevada is

*Reversed.*

---

[3] Petitioner argues that Rule 177(2) is a categorical speech prohibition which fails First Amendment analysis because of overbreadth. Petitioner interprets this subsection as providing that particular statements are "presumptively prohibited regardless of the circumstances surrounding the speech." Brief for Petitioner 48. Respondent does not read Rule 177(2)'s list of statements "ordinarily likely" to create material prejudice as establishing an evidentiary presumption, but rather as intended to "assist a lawyer" in compliance. Brief for Respondent 28, n. 27. The opinions of the Disciplinary Board and the Nevada Supreme Court do not address this point, though petitioner's reading is plausible, and at least one treatise supports petitioner's reading. See G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct 398–399 (1985) (analogous subsection (b) of ABA Model Rule 3.6 creates a presumption of prejudice). Given the lack of any discussion in the lower court opinion, and the other difficulties we find, we do not address these arguments.

APPENDIX TO OPINION OF KENNEDY, J.

Appendix A

*Petitioner's Opening Remarks at the Press Conference of February 5, 1988. App. to Pet. for Cert. 8a–9a.*

"MR. GENTILE: I want to start this off by saying in clear terms that I think that this indictment is a significant event in the history of the evolution of the sophistication of the City of Las Vegas, because things of this nature, of exactly this nature have happened in New York with the French connec- · tion case and in Miami with cases—at least two cases there— have happened in Chicago as well, but all three of those cities have been honest enough to indict the people who did it; the police department, crooked cops.

"When this case goes to trial, and as it develops, you're going to see that the evidence will prove not only that Grady Sanders is an innocent person and had nothing to do with any of the charges that are being leveled against him, but that the person that was in the most direct position to have stolen the drugs and money, the American Express Travelers' checks, is Detective Steve Scholl.

"There is far more evidence that will establish that Detective Scholl took these drugs and took these American Express Travelers' checks than any other living human being.

"And I have to say that I feel that Grady Sanders is being used as a scapegoat to try to cover up for what has to be obvious to people at the Las Vegas Metropolitan Police Department and at the District Attorney's office.

"Now, with respect to these other charges that are contained in this indictment, the so-called other victims, as I sit here today I can tell you that one, two—four of them are known drug dealers and convicted money launderers and drug dealers; three of whom didn't say a word about anything until after they were approached by Metro and after they were already in trouble and are trying to work themselves out of something.

"Now, up until the moment, of course, that they started going along with what detectives from Metro wanted them to say, these people were being held out as being incredible and liars by the very same people who are going to say now that you can believe them.

"Another problem that you are going to see develop here is the fact that of these other counts, at least four of them said nothing about any of this, about anything being missing until after the Las Vegas Metropolitan Police Department announced publicly last year their claim that drugs and American Express Travelers' c[h]ecks were missing.

"Many of the contracts that these people had show on the face of the contract that there is $100,000 in insurance for the contents of the box.

"If you look at the indictment very closely, you're going to see that these claims fall under $100,000.

"Finally, there were only two claims on the face of the indictment that came to our attention prior to the events of January 31 of '87, that being the date that Metro said that there was something missing from their box.

"And both of these claims were dealt with by Mr. Sanders and we're dealing here essentially with people that we're not sure if they ever had anything in the box.

"That's about all that I have to say."

[Questions from the floor followed.]

Appendix B

*Nevada Supreme Court Rule 177, as in effect prior to January 5, 1991.*

"Trial Publicity

"1. A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

"2. A statement referred to in subsection 1 ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

"(a) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

"(b) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

"(c) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

"(d) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

"(e) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

"(f) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

"3. Notwithstanding subsection 1 and 2(a–f), a lawyer involved in the investigation or litigation of a matter may state without elaboration:

"(a) the general nature of the claim or defense;

"(b) the information contained in a public record;

"(c) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

"(d) the scheduling or result of any step in litigation;

"(e) a request for assistance in obtaining evidence and information necessary thereto;

"(f) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

"(g) in a criminal case:

"(i) the identity, residence, occupation and family status of the accused;

"(ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

"(iii) the fact, time and place of arrest; and

"(iv) the identity of investigating and arresting officers or agencies and the length of the investigation."

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court with respect to Parts I and II, and delivered a dissenting opinion with respect to Part III, in which JUSTICE WHITE, JUSTICE SCALIA, and JUSTICE SOUTER join.

Petitioner was disciplined for making statements to the press about a pending case in which he represented a criminal defendant. The state bar, and the Supreme Court of Nevada on review, found that petitioner knew or should have known that there was a substantial likelihood that his statements would materially prejudice the trial of his client. Nonetheless, petitioner contends that the First Amendment to the United States Constitution requires a stricter standard to be met before such speech by an attorney may be disci-

plined: there must be a finding of "actual prejudice or a substantial and imminent threat to fair trial." Brief for Petitioner 15. We conclude that the "substantial likelihood of material prejudice" standard applied by Nevada and most other States satisfies the First Amendment.

## I

Petitioner's client was the subject of a highly publicized case, and in response to adverse publicity about his client, Gentile held a press conference on the day after Sanders was indicted. At the press conference, petitioner made, among others, the following statements:

> "When this case goes to trial, and as it develops, you're going to see that the evidence will prove not only that Grady Sanders is an innocent person and had nothing to do with any of the charges that are being leveled against him, but that the person that was in the most direct position to have stolen the drugs and the money, the American Express Travelers' checks, is Detective Steve Scholl.
>
> "There is far more evidence that will establish that Detective Scholl took these drugs and took these American Express Travelers' checks than any other living human being.
>
> . . . . .
>
> ". . . the so-called other victims, as I sit here today I can tell you that one, two—four of them are known drug dealers and convicted money launderers and drug dealers; three of whom didn't say a word about anything until after they were approached by Metro and after they were already in trouble and are trying to work themselves out of something.
>
> "Now, up until the moment, of course, that they started going along with what detectives from Metro wanted them to say, these people were being held out as being incredible and liars by the very same people who

are going to say now that you can believe them." App. to Pet. for Cert. 8a–9a.

The following statements were in response to questions from members of the press:

". . . because of the stigma that attaches to merely being accused—okay—I know I represent an innocent man . . . . The last time I had a conference with you, was with a client and I let him talk to you and I told you that that case would be dismissed and it was. Okay?

"I don't take cheap shots like this. I represent an innocent guy. All right?

. . . . .

"[The police] were playing very fast and loose. . . . We've got some video tapes that if you take a look at them, I'll tell you what, [Detective Scholl] either had a hell of a cold or he should have seen a better doctor." *Id.*, at 12a, 14a.

Articles appeared in the local newspapers describing the press conference and petitioner's statements. The trial took place approximately six months later, and although the trial court succeeded in empaneling a jury that had not been affected by the media coverage and Sanders was acquitted on all charges, the state bar disciplined petitioner for his statements.

The Southern Nevada Disciplinary Board found that petitioner knew the detective he accused of perpetrating the crime and abusing drugs would be a witness for the prosecution. It also found that petitioner believed others whom he characterized as money launderers and drug dealers would be called as prosecution witnesses. Petitioner's admitted purpose for calling the press conference was to counter public opinion which he perceived as adverse to his client, to fight back against the perceived efforts of the prosecution to poison the prospective juror pool, and to publicly present his client's side of the case. The board found that in light of the

statements, their timing, and petitioner's purpose, petitioner knew or should have known that there was a substantial likelihood that the statements would materially prejudice the Sanders trial.

The Nevada Supreme Court affirmed the board's decision, finding by clear and convincing evidence that petitioner "knew or reasonably should have known that his comments had a substantial likelihood of materially prejudicing the adjudication of his client's case." 106 Nev. 60, 62, 787 P. 2d 386, 387 (1990). The court noted that the case was "highly publicized"; that the press conference, held the day after the indictment and the same day as the arraignment, was "timed to have maximum impact"; and that petitioner's comments "related to the character, credibility, reputation or criminal record of the police detective and other potential witnesses." *Ibid.* The court concluded that the "absence of actual prejudice does not establish that there was no substantial likelihood of material prejudice." *Ibid.*

## II

Gentile asserts that the same stringent standard applied in *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976), to restraints on press publication during the pendency of a criminal trial should be applied to speech by a lawyer whose client is a defendant in a criminal proceeding. In that case, we held that in order to suppress press commentary on evidentiary matters, the State would have to show that "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Id.*, at 569. Respondent, on the other hand, relies on statements in cases such as *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), which sharply distinguished between restraints on the press and restraints on lawyers whose clients are parties to the proceeding:

> "Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." *Id.*, at 363.

To evaluate these opposing contentions, some reference must be made to the history of the regulation of the practice of law by the courts.

In the United States, the courts have historically regulated admission to the practice of law before them and exercised the authority to discipline and ultimately to disbar lawyers whose conduct departed from prescribed standards. "Membership in the bar is a privilege burdened with conditions," to use the oft-repeated statement of Cardozo, J., in *In re Rouss*, 221 N. Y. 81, 84, 116 N. E. 782, 783 (1917), quoted in *Theard v. United States*, 354 U. S. 278, 281 (1957).

More than a century ago, the first official code of legal ethics promulgated in this country, the Alabama Code of 1887, warned attorneys to "Avoid Newspaper Discussion of Legal Matters," and stated that "[n]ewspaper publications by an attorney as to the merits of pending or anticipated litigation . . . tend to prevent a fair trial in the courts, and otherwise prejudice the due administration of justice." H. Drinker, Legal Ethics 23, 356 (1953). In 1908, the American Bar Association promulgated its own code, entitled "Canons of Professional Ethics." Many States thereafter adopted the ABA Canons for their own jurisdictions. Canon 20 stated:

> "Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An *ex parte* reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in extreme cases it is better to avoid any *ex parte* statement."

In the last quarter century, the legal profession has reviewed its ethical limitations on extrajudicial statements by lawyers in the context of this Court's cases interpreting the First Amendment. ABA Model Rule of Professional Responsibility 3.6 resulted from the recommendations of the Advisory Committee on Fair Trial and Free Press (Advisory Committee), created in 1964 upon the recommendation of the Warren Commission. The Warren Commission's report on the assassination of President Kennedy included the recommendation that

> "representatives of the bar, law enforcement associations, and the news media work together to establish ethical standards concerning the collection and presentation of information to the public so that there will be no interference with pending criminal investigations, court proceedings, or the right of individuals to a fair trial."

Report of the President's Commission on the Assassination of President Kennedy (1964), quoted in Ainsworth, "Fair Trial-Free Press," 45 F. R. D. 417 (1968). The Advisory Committee developed the ABA Standards Relating to Fair Trial and Free Press, comprehensive guidelines relating to disclosure of information concerning criminal proceedings, which were relied upon by the ABA in 1968 in formulating Rule 3.6. The need for, and appropriateness of, such a rule had been identified by this Court two years earlier in *Sheppard* v. *Maxwell*, *supra*, at 362–363. In 1966, the Judicial Conference of the United States authorized a "Special Subcommittee to Implement *Sheppard* v. *Maxwell*" to proceed with a study of the necessity of promulgating guidelines or taking other corrective action to shield federal juries from prejudicial publicity. See Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, 45 F. R. D. 391, 404–407 (1968). Courts, responding to the recommendations in this report, proceeded to enact local rules incorporating these standards, and thus the "reasonable likelihood of prejudicing a fair trial" test was used by a majority of courts,

state and federal, in the years following *Sheppard*. Ten years later, the ABA amended its guidelines, and the "reasonable likelihood" test was changed to a "clear and present danger" test. ABA Standards for Criminal Justice 8–1.1 (as amended 1978) (2d ed. 1980, Supp. 1986).

When the Model Rules of Professional Conduct were drafted in the early 1980's, the drafters did not go as far as the revised fair trial-free press standards in giving precedence to the lawyer's right to make extrajudicial statements when fair trial rights are implicated, and instead adopted the "substantial likelihood of material prejudice" test. Currently, 31 States in addition to Nevada have adopted—either verbatim or with insignificant variations—Rule 3.6 of the ABA's Model Rules.[1] Eleven States have adopted Disciplinary Rule 7–107 of the ABA's Code of Professional Responsibility, which is less protective of lawyer speech than Model Rule 3.6, in that it applies a "reasonable likelihood of prejudice" standard.[2] Only one State, Virginia, has explicitly adopted a clear and present danger standard, while four States and the District of Columbia have adopted standards that arguably approximate "clear and present danger."[3]

---

[1] Arizona, Arkansas, Connecticut, Idaho, Indiana, Kansas, Kentucky, Maryland, Mississippi, Missouri, New Mexico, Pennsylvania, Rhode Island, South Carolina, West Virginia, and Wyoming have adopted Model Rule 3.6 verbatim. Delaware, Florida, Louisiana, Montana, New Hampshire, New Jersey, New York, Oklahoma, South Dakota, Texas, and Wisconsin have adopted Model Rule 3.6 with minor modifications that are irrelevant to the issues presented in this case. Michigan and Washington have adopted only subsection (a) of Model Rule 3.6, and Minnesota has adopted only subsection (a) and limits its application to "pending criminal jury trial[s]." Utah adopted a version of Model Rule 3.6 employing a "substantial likelihood of materially influencing" test.

[2] Alaska, Colorado, Georgia, Hawaii, Iowa, Massachusetts, Nebraska, Ohio, Tennessee, and Vermont have adopted Disciplinary Rule 7–107 verbatim. North Carolina also uses the "reasonable likelihood of . . . prejudic[e]" test. Rule of Professional Conduct 7.7 (1991).

[3] Illinois Rule of Professional Conduct 3.6 (1990) ("serious and imminent threat to the fairness of an adjudicative proceeding"); Maine Bar Rule of

Petitioner maintains, however, that the First Amendment to the United States Constitution requires a State, such as Nevada in this case, to demonstrate a "clear and present danger" of "actual prejudice or an imminent threat" before any discipline may be imposed on a lawyer who initiates a press conference such as occurred here.[4] He relies on decisions such as *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976), *Bridges* v. *California,* 314 U. S. 252 (1941), *Pennekamp* v. *Florida,* 328 U. S. 331 (1946), and *Craig* v. *Harney,* 331 U. S. 367 (1947), to support his position. In those cases we held that trial courts might not constitutionally punish, through use of the contempt power, newspapers and others for publishing editorials, cartoons, and other items critical of judges in particular cases. We held that such punishments could be imposed only if there were a clear and present danger of "some serious substantive evil which they are designed to avert." *Bridges* v. *California, supra,* at 270. Petitioner also relies on *Wood* v. *Georgia,* 370 U. S.

Professional Responsibility 3.7(j) (1990) ("substantial danger of interference with the administration of justice"); North Dakota Rule of Professional Conduct 3.6 (1990) ("serious and imminent threat of materially prejudicing an adjudicative proceeding"); Oregon DR 7–107 (1991) ("serious and imminent threat to the fact-finding process in an adjudicative proceeding and acts with indifference to that effect"); and the District of Columbia DR 7–101 (Supp. 1991) ("serious and imminent threat to the impartiality of the judge or jury").

[4] We disagree with JUSTICE KENNEDY's statement that this case "does not call into question the constitutionality of other States' prohibitions upon an attorney's speech that will have a 'substantial likelihood of materially prejudicing an adjudicative proceeding,' but is limited to Nevada's interpretation of that standard." *Ante,* at 1034. Petitioner challenged Rule 177 as being unconstitutional on its face in addition to as applied, contending that the "substantial likelihood of material prejudice" test was unconstitutional, and that lawyer speech should be punished only if it violates the standard for clear and present danger set forth in *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976). See Brief for Petitioner 27–31. The validity of the rules in the many States applying the "substantial likelihood of material prejudice" test has, therefore, been called into question in this case.

375 (1962), which held that a court might not punish a sheriff for publicly criticizing a judge's charges to a grand jury.

Respondent State Bar of Nevada points out, on the other hand, that none of these cases involved lawyers who represented parties to a pending proceeding in court. It points to the statement of Holmes, J., in *Patterson* v. *Colorado ex rel. Attorney General of Colorado*, 205 U. S. 454, 463 (1907), that "[w]hen a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." Respondent also points to a similar statement in *Bridges*, *supra*, at 271:

> "The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."

These opposing positions illustrate one of the many dilemmas which arise in the course of constitutional adjudication. The above quotes from *Patterson* and *Bridges* epitomize the theory upon which our criminal justice system is founded: The outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on material admitted into evidence before them in a court proceeding. Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and *ex parte* statements by counsel giving their version of the facts obviously threaten to undermine this basic tenet.

At the same time, however, the criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system. The way most of them acquire information is from the media. The First Amendment protections of speech and press have been held, in the cases cited above, to require a showing of

"clear and present danger" that a malfunction in the criminal justice system will be caused before a State may prohibit media speech or publication about a particular pending trial. The question we must answer in this case is whether a lawyer who represents a defendant involved with the criminal justice system may insist on the same standard before he is disciplined for public pronouncements about the case, or whether the State instead may penalize that sort of speech upon a lesser showing.

It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. *Sacher* v. *United States*, 343 U. S. 1, 8 (1952) (criminal trial); *Fisher* v. *Pace*, 336 U. S. 155 (1949) (civil trial). Even outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U. S. 622 (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The plurality opinion, which found the discipline improper, concluded that the comments had not in fact impugned the judge's integrity. Justice Stewart, who provided the fifth vote for reversal of the sanction, said in his separate opinion that he could not join any possible "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct." *Id.*, at 646. He said that "[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id.*, at 646–647. The four dissenting Justices who would have sustained the discipline said:

"Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer.

. . . . .

"He is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *Id.*, at 666, 668 (Frankfurter, J., dissenting, joined by Clark, Harlan, and Whittaker, JJ.).

Likewise, in *Sheppard* v. *Maxwell*, where the defendant's conviction was overturned because extensive prejudicial pretrial publicity had denied the defendant a fair trial, we held that a new trial was a remedy for such publicity, but

"we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. *Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.*" 384 U. S., at 363 (emphasis added).

We expressly contemplated that the speech of *those participating before the courts* could be limited.[5] This distinction

---

[5] The Nevada Supreme Court has consistently read all parts of Rule 177 as applying only to lawyers in pending cases, and not to other lawyers or nonlawyers. We express no opinion on the constitutionality of a rule regulating the statements of a lawyer who is not participating in the pending case about which the statements are made. We note that of all the cases petitioner cites as supporting the use of the clear and present danger

between participants in the litigation and strangers to it is brought into sharp relief by our holding in *Seattle Times Co. v. Rhinehart*, 467 U. S. 20 (1984). There, we unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery. In that case we said that "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting," *id.*, at 32–33, n. 18 (citation omitted), and noted that "on several occasions [we have] approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant." *Ibid.*

Even in an area far from the courtroom and the pendency of a case, our decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses. See, *e. g.*, *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977); *Peel* v. *Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U. S. 9 (1990); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978). In each of these cases, we engaged in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue. These cases

---

standard, the only one that even arguably involved a nonthird party was *Wood* v. *Georgia*, 370 U. S. 375 (1962), where a county sheriff was held in contempt for publicly criticizing instructions given by a judge to a grand jury. Although the sheriff was technically an "officer of the court" by virtue of his position, the Court determined that his statements were made in his capacity as a private citizen, with no connection to his official duties. *Id.*, at 393. The same cannot be said about petitioner, whose statements were made in the course of, and in furtherance of, his role as defense counsel.

recognize the long-established principle stated in *In re Cohen*, 7 N. Y. 2d 488, 495, 166 N. E. 2d 672, 675 (1960):

> "Appellant as a citizen could not be denied any of the common rights of citizens. But he stood before the inquiry and before the Appellate Division in another quite different capacity, also. As a lawyer he was 'an officer of the court, and, like the court itself, an instrument . . . of justice . . . .'" (quoted in *Cohen* v. *Hurley*, 366 U. S. 117, 126 (1961)).

We think that the quoted statements from our opinions in *In re Sawyer*, 360 U. S. 622 (1959), and *Sheppard* v. *Maxwell, supra*, rather plainly indicate that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976), and the cases which preceded it. Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. As noted by Justice Brennan in his concurring opinion in *Nebraska Press*, which was joined by Justices Stewart and MARSHALL, "[a]s officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." *Id.*, at 601, n. 27. Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative. See, *e. g., In re Hinds*, 90 N. J. 604, 627, 449 A. 2d 483, 496 (1982) (statements by attorneys of record relating to the case "are likely to be considered knowledgeable, reliable and true" because of attorneys' unique access to information); *In re Rachmiel*, 90 N. J. 646, 656, 449 A. 2d 505, 511 (1982) (attorneys' role as advocates

gives them "extraordinary power to undermine or destroy the efficacy of the criminal justice system"). We agree with the majority of the States that the "substantial likelihood of material prejudice" standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials.

When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question. See, e. g., Seattle Times, supra, at 32. The "substantial likelihood" test embodied in Rule 177 is constitutional under this analysis, for it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech. The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right. See, e. g., Sheppard, 384 U. S., at 350–351; Turner v. Louisiana, 379 U. S. 466, 473 (1965) (evidence in criminal trial must come solely from witness stand in public courtroom with full evidentiary protections). Even if a fair trial can ultimately be ensured through voir dire, change of venue, or some other device, these measures entail serious costs to the system. Extensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements such as those made by petitioner. The State has a substantial interest in preventing officers of the court, such as lawyers, from imposing such costs on the judicial system and on the litigants.

The restraint on speech is narrowly tailored to achieve those objectives. The regulation of attorneys' speech is limited—it applies only to speech that is substantially likely to have a materially prejudicial effect; it is neutral as to points of view, applying equally to all attorneys participating in a pending case; and it merely postpones the attorneys' comments until after the trial. While supported by the substantial state interest in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity, the Rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding.

## III

To assist a lawyer in deciding whether an extrajudicial statement is problematic, Rule 177 sets out statements that are likely to cause material prejudice. Contrary to petitioner's contention, these are not improper evidentiary presumptions. Model Rule 3.6, from which Rule 177 was derived, was specifically designed to avoid the categorical prohibitions of attorney speech contained in ABA Model Code of Professional Responsibility Disciplinary Rule 7–107 (1981). See ABA Commission on Evaluation of Professional Standards, Model Rules of Professional Conduct, Notes and Comments 143–144 (Proposed Final Draft, May 30, 1981) (Proposed Final Draft). The statements listed as likely to cause material prejudice closely track a similar list outlined by this Court in *Sheppard:*

> "The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. . . . Effective control of these sources—concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity . . . .

> "More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party,

witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. See *State* v. *Van Duyne*, 43 N. J. 369, 389, 204 A. 2d 841, 852 (1964), in which the court interpreted Canon 20 of the American Bar Association's Canons of Professional Ethics to prohibit such statements." 384 U. S., at 361.

Gentile claims that Rule 177 is overbroad, and thus unconstitutional on its face, because it applies to more speech than is necessary to serve the State's goals. The "overbreadth" doctrine applies if an enactment "prohibits constitutionally protected conduct." *Grayned* v. *City of Rockford*, 408 U. S. 104, 114 (1972). To be unconstitutional, overbreadth must be "substantial." *Board of Trustees of State University of N. Y.* v. *Fox*, 492 U. S. 469, 485 (1989). Rule 177 is no broader than necessary to protect the State's interests. It applies only to lawyers involved in the pending case at issue, and even those lawyers involved in pending cases can make extrajudicial statements as long as such statements do not present a substantial risk of material prejudice to an adjudicative proceeding. The fact that Rule 177 applies to bench trials does not make it overbroad, for a substantial likelihood of prejudice is still required before the Rule is violated. That test will rarely be met where the judge is the trier of fact, since trial judges often have access to inadmissible and highly prejudicial information and are presumed to be able to discount or disregard it. For these reasons Rule 177 is constitutional on its face.

Gentile also argues that Rule 177 is void for vagueness because it did not provide adequate notice that his comments were subject to discipline. The void-for-vagueness doctrine is concerned with a defendant's right to fair notice and ade-

quate warning that his conduct runs afoul of the law. See, *e. g.*, *Smith* v. *Goguen*, 415 U. S. 566, 572–573 (1974); *Colten* v. *Kentucky*, 407 U. S. 104, 110 (1972). Rule 177 was drafted with the intent to provide "an illustrative compilation that gives fair notice of conduct ordinarily posing unacceptable dangers to the fair administration of justice." Proposed Final Draft 143. The Rule provides sufficient notice of the nature of the prohibited conduct. Under the circumstances of his case, petitioner cannot complain about lack of notice, as he has admitted that his primary objective in holding the press conference was the violation of Rule 177's core prohibition—to prejudice the upcoming trial by influencing potential jurors. Petitioner was clearly given notice that such conduct was forbidden, and the list of conduct likely to cause prejudice, while only advisory, certainly gave notice that the statements made would violate the Rule if they had the intended effect.

The majority agrees with petitioner that he was the victim of unconstitutional vagueness in the regulations because of the relationship between § 3 and §§ 1 and 2 of Rule 177 (see *ante*, at 1033–1034). Section 3 allows an attorney to state "the general nature of the claim or defense" notwithstanding the prohibition contained in § 1 and the examples contained in § 2. It is of course true, as the majority points out, that the word "general" and the word "elaboration" are both terms of degree. But combined as they are in the first sentence of § 3, they convey the very definite proposition that the authorized statements must not contain the sort of detailed allegations that petitioner made at his press conference. No sensible person could think that the following were "general" statements of a claim or defense made "without elaboration": "the person that was in the most direct position to have stolen the drugs and the money . . . is Detective Steve Scholl"; "there is far more evidence that will establish that Detective Scholl took these drugs and took these American Express Travelers' checks than any other living human being"; "[Detective

Scholl] either had a hell of a cold, or he should have seen a better doctor"; and "the so-called other victims . . . one, two—four of them are known drug dealers and convicted money launderers." Section 3, as an exception to the provisions of §§ 1 and 2, must be read in the light of the prohibitions and examples contained in the first two sections. It was obviously not intended to negate the prohibitions or the examples wholesale, but simply intended to provide a "safe harbor" where there might be doubt as to whether one of the examples covered proposed conduct. These provisions were not vague as to the conduct for which petitioner was disciplined; "[i]n determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 33 (1963).

Petitioner's strongest arguments are that the statements were made well in advance of trial, and that the statements did not in fact taint the jury panel. But the Supreme Court of Nevada pointed out that petitioner's statements were not only highly inflammatory—they portrayed prospective government witnesses as drug users and dealers, and as money launderers—but the statements were timed to have maximum impact, when public interest in the case was at its height immediately after Sanders was indicted. Reviewing independently the entire record, see *Pennekamp* v. *Florida*, 328 U. S., at 335, we are convinced that petitioner's statements were "substantially likely to cause material prejudice" to the proceedings. While there is evidence pro and con on that point, we find it persuasive that, by his own admission, petitioner called the press conference for the express purpose of influencing the venire. It is difficult to believe that he went to such trouble, and took such a risk, if there was no substantial likelihood that he would succeed.

While in a case such as this we must review the record for ourselves, when the highest court of a State has reached a determination "we give most respectful attention to its rea-

soning and conclusion." *Ibid.* The State Bar of Nevada, which made its own factual findings, and the Supreme Court of Nevada, which upheld those findings, were in a far better position than we are to appreciate the likely effect of petitioner's statements on potential members of a jury panel in a highly publicized case such as this. The board and the Nevada Supreme Court did not apply the list of statements likely to cause material prejudice as presumptions, but specifically found that petitioner had intended to prejudice the trial,[6] and that based upon the nature of the statements and their timing, they were in fact substantially likely to cause material prejudice. We cannot, upon our review of the record, conclude that they were mistaken. See *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 394–396 (1948).

---

[6]JUSTICE KENNEDY appears to contend that there can be no material prejudice when the lawyer's publicity is in response to publicity favorable to the other side. *Ante,* at 1041–1043. JUSTICE KENNEDY would find that publicity designed to counter prejudicial publicity cannot be itself prejudicial, despite its likelihood of influencing potential jurors, unless it actually would go so far as to cause jurors to be affirmatively biased in favor of the lawyer's client. In the first place, such a test would be difficult, if not impossible, to apply. But more fundamentally, it misconceives the constitutional test for an impartial juror—whether the "'juror can lay aside his impression or opinion and render a verdict on the evidence presented in court.'" *Murphy* v. *Florida*, 421 U. S. 794, 800 (1975) (quoting *Irvin* v. *Dowd*, 366 U. S. 717, 723 (1961)). A juror who may have been initially swayed from open-mindedness by publicity favorable to the prosecution is not rendered fit for service by being bombarded by publicity favorable to the defendant. The basic premise of our legal system is that lawsuits should be tried in court, not in the media. See, *e. g.*, *Bridges* v. *California*, 314 U. S. 252, 271 (1941); *Patterson* v. *Colorado ex rel. Attorney General of Colorado*, 205 U. S. 454, 462 (1970). A defendant may be protected from publicity by, or in favor of, the police, and prosecution through *voir dire*, change of venue, jury instructions, and, in extreme cases, reversal on due process grounds. The remedy for prosecutorial abuses that violate the rule lies not in self-help in the form of similarly prejudicial comments by defense counsel, but in disciplining the prosecutor.

Several *amici* argue that the First Amendment requires the State to show actual prejudice to a judicial proceeding before an attorney may be disciplined for extrajudicial statements, and since the board and the Nevada Supreme Court found no actual prejudice, petitioner should not have been disciplined. But this is simply another way of stating that the stringent standard of *Nebraska Press* should be applied to the speech of a lawyer in a pending case, and for the reasons heretofore given we decline to adopt it. An added objection to the stricter standard when applied to lawyer participants is that if it were adopted, even comments more flagrant than those made by petitioner could not serve as the basis for disciplinary action if, for wholly independent reasons, they had no effect on the proceedings. An attorney who made prejudicial comments would be insulated from discipline if the government, for reasons unrelated to the comments, decided to dismiss the charges, or if a plea bargain were reached. An equally culpable attorney whose client's case went to trial would be subject to discipline. The United States Constitution does not mandate such a fortuitous difference.

When petitioner was admitted to practice law before the Nevada courts, the oath which he took recited that "I will support, abide by and follow the Rules of Professional Conduct as are now or may hereafter be adopted by the Supreme Court . . . ." Rule 73, Nevada Supreme Court Rules (1991). The First Amendment does not excuse him from that obligation, nor should it forbid the discipline imposed upon him by the Supreme Court of Nevada.

I would affirm the decision of the Supreme Court of Nevada.

JUSTICE O'CONNOR, concurring.

I agree with much of THE CHIEF JUSTICE's opinion. In particular, I agree that a State may regulate speech by lawyers representing clients in pending cases more readily than it may regulate the press. Lawyers are officers of the court

and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech. See *In re Sawyer*, 360 U. S. 622, 646–647 (1959) (Stewart, J., concurring in result). This does not mean, of course, that lawyers forfeit their First Amendment rights, only that a less demanding standard applies. I agree with THE CHIEF JUSTICE that the "substantial likelihood of material prejudice" standard articulated in Rule 177 passes constitutional muster. Accordingly, I join Parts I and II of THE CHIEF JUSTICE's opinion.

For the reasons set out in Part III of JUSTICE KENNEDY's opinion, however, I believe that Nevada's Rule is void for vagueness. Section (3) of Rule 177 is a "safe harbor" provision. It states that "notwithstanding" the prohibitory language located elsewhere in the Rule, "a lawyer involved in the investigation or litigation may state without elaboration . . . [t]he general nature of the claim or defense." Gentile made a conscious effort to stay within the boundaries of this "safe harbor." In his brief press conference, Gentile gave only a rough sketch of the defense that he intended to present at trial—*i. e.*, that Detective Scholl, not Grady Sanders, stole the cocaine and traveler's checks. When asked to provide more details, he declined, stating explicitly that the ethical rules compelled him to do so. *Ante*, at 1049. Nevertheless, the disciplinary board sanctioned Gentile because, in its view, his remarks went beyond the scope of what was permitted by the Rule. Both Gentile and the disciplinary board have valid arguments on their side, but this serves to support the view that the Rule provides insufficient guidance. As JUSTICE KENNEDY correctly points out, a vague law offends the Constitution because it fails to give fair notice to those it is intended to deter and creates the possibility of discriminatory enforcement. See *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 42 (1991) (O'CONNOR, J., dissenting). I join Parts III and VI of JUSTICE KENNEDY's opinion reversing the judgment of the Nevada Supreme Court on that basis.