CAVANAGH, J.
(dissenting). I agree with the majority that a trial court has the authority to control courtroom proceedings; however, this control must comport with the First Amendment. The desire for “preserving an organized polity,” ante at 375, cannot be éxercised at the expense of an individual’s First Amendment right to free speech. Because I believe that the trial court abused its discretion when it dismissed plaintiffs case with prejudice and because I vehemently disagree with the majority’s belief that its opinion today does not violate the Constitution, I must respectfully dissent. Further, because I agree with Justice WEAVER that the majority’s decision undermines the basic tenets of our judicial system, I also concur with her dissent.
I. THE STANDARDS FOR REVIEWING THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS
Plaintiff Justine Maldonado’s cause of action for sexual harassment against Daniel Bennett and defendant Ford Motor Company was dismissed with prejudice on August 21, 2002, because the trial court believed that plaintiff and her attorneys engaged in prejudicial *406 pretrial publicity. The Michigan Rules of Professional Conduct (MRPC) have an established court rule that specifically governs trial publicity. MRPC 3.6 states:
A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding. [Emphasis added.]
The United States Supreme Court examined the “substantial likelihood of material prejudice” standard in Gentile v State Bar of Nevada, 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991), in light of the First Amendment.[1] The Supreme Court observed that this standard “imposes only narrow and necessary limitations on lawyers’ speech.” Id. at 1075. As the Supreme Court has also noted, “the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press.” Bridges v California, 314 US 252, 262; 62 S Ct 190; 86 L Ed 192 (1941). The evil must be substantial and “extremely serious and the degree of imminence extremely high before utterances can be punished.” Id. at 263.
*407 II. THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS WAS NOT SUBSTANTIALLY LIKELY TO MATERIALLY PREJUDICE THE TRIAL
The conduct of plaintiff and her attorneys was not substantially likely to materially prejudice the trial. When plaintiff filed her sexual harassment cause of action, the Detroit Free Press published an article about the filing on June 9, 2000. Plaintiff also held a press conference about the filing of her complaint. From that time forward, Bennett’s indecent exposure conviction was a matter of public record, available to any member of the public, including any journalist.
Long before Bennett’s indecent exposure conviction was ultimately expunged on November 9, 2001, and the trial court made a general statement to the parties about pretrial publicity on June 21, 2002, the indecent exposure conviction and the facts surrounding it were well-publicized. Accordingly, it is improper to blame plaintiff and her attorneys for every subsequent mention of Bennett’s indecent exposure conviction, as the majority has, because information about his conviction was available from numerous sources. Journalists had access to this information from the time the complaint was filed, and journalists attended public courtroom proceedings, as they are allowed to do. Police reports were readily available to anyone who properly requested them. This information was contained in pleadings in the circuit court, the Court of Appeals, and this Court, and no objection was made. Further, the indecent exposure conviction was repeatedly discussed in open court. So regardless of whether plaintiff was the original provider of the information, any novice journalist willing to do a nominal amount of research would have ultimately discovered the conviction. See, e.g., Gentile, supra at 1046 (Kennedy, J.) (Although the petitioner shared the information with journalists, it *408 was also “available to any journalist willing to do a little bit of investigative work.”).
Over seven months after information about Bennett’s indecent exposure conviction was first made known in relation to this case, on January 19, 2001, Judge Kathleen Macdonald granted a motion to exclude evidence of Bennett’s indecent exposure conviction from plaintiffs trial.[2] Later, on February 16, 2001, the trial court granted a motion to exclude any evidence related to Bennett’s indecent exposure conviction. However, these decisions did not preclude plaintiff and her attorneys from ever mentioning the indecent exposure conviction in public again, and it is erroneous to attempt to portray them as such. While the majority refers to an order by Judge Macdonald that witnesses who mentioned Bennett’s indecent exposure conviction would be considered in contempt of court, this order applied to Lula Elezovic’s case, not plaintiffs case, and the order applied only to testimony given in court. This order did not restrict plaintiff’s right to discuss Bennett’s indecent exposure conviction in public settings as it relates to her case.
Notably, in between the two decisions excluding evidence of Bennett’s indecent exposure conviction, on *409 January 28, 2001, the New York Times published a lengthy article about the multiple claims of sexual harassment at defendant’s plant. The article also mentioned Bennett’s indecent exposure conviction, including a reference to the indecent exposure conviction made by the former plant manager for defendant’s Wixom plant. Another article was published on June 12, 2002, in the Metro-Times. In the article, plaintiff is quoted as saying, “They are investigating everything in my life, but not the man who did it to me, not the man who had the criminal record, was in a company car and exposed himself to high-school girls and was convicted of it.” However, the article also stated that “[according to Ford and Bennett’s attorney,” plaintiff began weaving her tale after she learned of Bennett’s indecent exposure conviction.[3] Bennett’s attorney also talked about Bennett’s indecent exposure conviction in the article, as well as how Bennett was falsely accused by the girls and how the conviction was expunged. Bennett’s conviction was also mentioned by the attorney for Lula Elezovic, a woman who also alleged that Bennett sexually harassed her; Pamela Perez, another woman who alleged that Bennett sexually harassed her; and a former plant manager for defendant. While the majority *410 contends that it was proper for the trial court to dismiss plaintiffs case with prejudice for mentioning Bennett’s indecent exposure conviction, it conveniently ignores the fact that defendant’s attorney and Bennett’s attorney also did the same to advance their theory of the case to the public.
On May 17, 2002, another evidentiary hearing was held in front of Judge William Giovan.[4] At a conference in chambers, defendant’s attorney requested a gag order directing plaintiffs attorneys not to publicize Bennett’s expunged indecent exposure conviction. The court declined to issue a gag order.
In the course of another evidentiary hearing on June 21, 2002, the trial court briefly stated that it would dismiss the case if it found that a party was “causing some difficulty in our getting a fair jury ....” Yet this “explicit warning,” as the majority repeatedly calls it, was so vague and fleeting that it cannot possibly take the place of a formal court order. It provided no guidance to the parties about what conduct was prohibited and clearly made no specific mention of Bennett’s expunged conviction. Moreover, because the conviction had been previously referenced in the media and the trial court had refused to issue a gag order to prohibit this conduct, there can be no fair inference drawn from the trial court’s offhand comment that it was now prohibiting any mention of the conviction.
It is important to note that the entire exchange about the possibility of dismissal occurred in an offhand manner as follows:
Mr. Morgan [Bennett’s counsel]: But first, they tried Mr. Bennett’s deposition, and they unilaterally scheduled it for *411 the 12th, knowing that they had fed the Metro Times with all the information for that horribly one-sided, inflammatory article that came out — [5]
The Court: You think it was one-sided?
Mr. Morgan: I haven’t heard anyone comment to me to the contrary in the past week and a half.
The Court: I will just tell you that I don’t know who it was, but somebody thought that it made a fair presentation. That’s neither here nor there, if that makes you feel any better.
Mr. Morgan: Well, the night before, and my client was ready to appear for the deposition in the Perez case. We had filed a motion for a protective order that we had scheduled for the previous Friday, and that motion for a protective order was, number one, to have the judge limit—
The Court: But, you know, since you mentioned that article, where’s this coming from? I thought that there is a prohibition against counsel speaking to — making public statements designed to affect litigation.
Ms. Hardy [defendant’s counsel]: There certainly is. There’s an ethics rule which prohibits counsel from intentionally trying to taint a jury pool by making the public aware of excluded evidence, which is exactly what’s been occurring for quite some time.
The Court: Is counsel being quoted in this?
Mr. Washington [plaintiff’s counsel]: I think counsel on both sides. Ford was not, but Mr. Morgan and Ms. Massie [plaintiffs attorney] and I were both quoted, all quoted.
The Court: I’m not sure — well—
*412 Ms. Hardy: It was initiated, without doubt, and Mr. Washington will not dispute this, by Mr. Washington, as all the press has been initiated by his office, and the constant publicity is one issue, but the really serious issue is the effort by Mr. Washington to make sure that the press continues to report evidence or information concerning this expunged conviction so that some way, somehow, irrespective of this Court’s ruling—
The Court: I’m not making any decisions about this, hut I’m going to tell you one thing. If I ever reach the conclusion that somebody is violating that ethical obligation and causing some difficulty in our getting a fair jury, I will dismiss the case with prejudice, or, and I should say, on the other side, grant a default judgment. I just want everyone to know that. And then whatever counsel is involved can answer to their client. [Emphasis added.]
Contrary to the majority’s assertions, the trial court did not advise the parties “in no uncertain terms that references to the excluded conviction were to cease.” Ante at 394 n 23. And the trial court did not “explicitly warn[] the parties and the attorneys that further references to the excluded conviction would result in dismissal.” Id. In fact, there was no “explicit warning” that the case would be dismissed if remarks about the conviction were made, and there was no warning about what conduct would result in dismissal. A review of the quoted transcript of the exchange reveals that not once does the trial court even utter a word about the expunged indecent exposure conviction or excluded evidence.
Remarkably, I need only quote the trial court’s own words to show the falsity of the majority’s position that the trial court “explicitly warned the parties that [it] would dismiss the case if the inappropriate remarks regarding the excluded conviction continued.” Ante at 393. The trial court itself stated, “I told everybody then [at the May 17 hearing], certainly in chambers and *413 maybe again after that on the record, I don’t know that I repeated it on the record, that I had no intention of telling anyone what they can say.” (Emphasis added.) At another hearing, the trial court stated, “I think I don’t have the right to decide for myself what a lawyer can say to the public. I do not have that right.” And finally and most importantly, “I have never issued such an order in my life.” Therefore, I fail to see how the majority can characterize the trial court’s words as being an “explicit warning” when the trial court itself does not believe it issued such a warning.
The trial court’s own statements that it did not issue an order or warning that explicitly restricted what could be said should persuade a reasonable reader that no such order was entered or warning issued that prohibited the mention of the indecent exposure conviction. Yet the majority chooses to ignore this reality in favor of a factual scenario that it created and that it wishes had occurred. The majority attempts to portray an order excluding evidence from trial as having the same effect as an order precluding any mention of this evidence in public, and this erroneous portrayal is the crux of the majority’s analysis. Remarkably, the majority’s entire analysis relies on the faulty premise that two orders — one of which was never even entered — dealing with different topics and restricting different conduct can actually be the same. But an order excluding evidence is not magically transformed into an order precluding the mention of the evidence in public no matter how much the majority wishes it were so. Unfortunately, I believe that the majority has steadfastly refused to acknowledge the difference because it would show that its analysis is insupportable.
While the majority labels as “preposterous” the dissent’s position that an order excluding evidence from a *414 trial is not the same as an order precluding the mention of this evidence in public, the majority never goes beyond name-calling to explain its position that an order excluding evidence now means that this evidence can never be mentioned in any forum again. Unfortunately, the majority’s insistence on resorting to such tactics and its refusal to explain its position is becoming standard operating procedure whenever the majority cannot legally support its position. In this case, the majority so desires a specific outcome that it ignores the fact that an order excluding evidence cannot be labeled an order precluding mention of this evidence in public, and this blind adherence to its favored outcome leads it to espouse a position that is completely indefensible.
Moreover, the trial court’s brief remarks at the evidentiary hearing about ethical obligations were made with no hearing or information about what plaintiff and her attorneys had or had not been doing. There is no indication that the trial court believed that plaintiff and her attorneys had been engaging in misconduct and that they must now cease any of their activities. The trial court’s general comments were made in passing to both parties. There was no formal or informal hearing on this matter-, there was only an extremely brief exchange. Also, contrary to the majority’s contention, a comment made by plaintiff at a rally protesting sexual harassment is not adequate evidence that plaintiff understood the trial court’s June 21, 2002, “order.” In response to a reporter’s question at the rally, plaintiff stated that she was not going to quit fighting sexual harassment, even if that meant that her case would be dismissed. However, the news report does not show the question posed by the reporter that prompted plaintiffs statement. Notably, there was no mention of Bennett’s expunged conviction during this news broadcast. What was mentioned during the broadcast was a statement *415 by a spokeswoman for defendant, in which she said that she would not comment on the case, but she did note that the judge had asked those involved to refrain from drawing attention to the case. While the majority draws the conclusion from the broadcast that plaintiff somehow understood a limitation on referencing Bennett’s expunged conviction when no such limitation was ever ordered or discussed by the trial court, I draw no such conclusion. It is highly probable that plaintiff was referring to the same directive that defendant’s spokeswoman was referencing — that the trial judge asked the parties to refrain from drawing unnecessary attention to the case. But there is no indication that such a vague “request” was somehow transformed into an “order” regarding referring to Bennett’s expunged conviction merely by plaintiffs comment.[6]
As it relates to the conduct of plaintiffs attorneys, the majority states that it was misconduct for plaintiffs attorneys to have “appeared in television news broadcasts that specifically referred to Bennett’s expunged conviction.” Ante at 395. Yet, in over ten televised news reports, plaintiff and her attorneys do not once mention Bennett’s indecent exposure conviction or the events that led to the conviction. Notably, the only person to comment off-camera on the conviction in one of the news reports is a spokesperson for defendant. Further, while the 1995 conviction is referenced in various televised news reports, an attorney for Bennett or defendant appears in each one of these reports. If it was *416 misconduct for plaintiffs attorneys to appear in these reports, I fail to see why defendant is not being held to a similar standard.
I further note that, in a September 12, 2001, article by The Associated Press, it is Bennett’s attorney who mentions the indecent exposure conviction, not plaintiffs attorneys. In an October 10, 2001, article in the Detroit Free Press, it is again Bennett’s attorney who mentions the indecent exposure conviction as he characterizes plaintiff and the other women who allege sexual harassment by Bennett as women who are lying, looking for easier jobs, “out to make a quick buck,” and attempting to capitalize on Bennett’s indecent exposure conviction.
Notably, “in some circumstances press comment is necessary to protect the rights of the client and prevent abuse of the courts.” Gentile, supra at 1058 (Kennedy, J.). “[A]n attorney may take reasonable steps to defend a client’s reputation----” Id. at 1043. In this case, defendant made numerous comments to the media regarding plaintiff and her claims of sexual harassment. Bennett’s and defendant’s strategy was clear. Plaintiff was a liar. Bennett’s attorney made repeated, explicit statements to the media — plaintiff and the other women who alleged sexual harassment were lying. Defendant’s attorney stated that plaintiff had “credibility issues.” In the June 12, 2002, Metro-Times article, Bennett’s attorney said that plaintiff and the other women suing defendant and Bennett were lying about the harassment and were motivated in large part by greed. Defendant’s defense was summarized as being that “Maldonado is an overweight opportunist who is colluding with co-workers to make a fortune by falsely accusing Bennett of sexual harassment and falsely accusing the company of doing nothing about it.” Pre *417 trial allegations against Maldonado included an assertion that she had had sex in a car in defendant’s parking lot and frequently took her underwear off at work and hung it for all to see. And defendant’s attorney repeatedly attempted to trivialize testimony and evidence that other women had been sexually harassed by Bennett by referring to this as “me too” evidence.
In light of the forceful and contentious tactics engaged in by both parties, I do not believe that the mere mention of an expunged conviction of indecent exposure that some jurors might hear had a substantial likelihood of materially prejudicing the trial. See, e.g., Gentile, supra at 1058 (Statements made by an attorney alleging that the police department and the prosecutor’s office were corrupt were not substantially likely to materially prejudice the proceedings.). It is not surprising that defendant would make this argument because it would like as little attention as possible paid to this case because it finds itself defending yet another sexual harassment claim involving Bennett. What is surprising, however, is that the majority agrees with defendant and takes the position that dismissal with prejudice is a reasonable response for the courts in a matter in which plaintiff and her attorneys have behaved in a manner entirely consistent with the actions of defendant’s attorneys.
Simply, if plaintiff and her attorneys are criticized for seeking to influence the public perception of events by talking about Bennett’s indecent exposure conviction, then I fail to see how defendant’s attorneys were not attempting to do the same. Both parties sought to negatively portray their adversary’s position in the media. While plaintiff is criticized by the trial court for sending out a press release, defendant also sent out *418 press releases involving this case, yet it is only plaintiff who is being penalized with the extreme sanction of dismissal with prejudice.[7]
The attention paid to this case unmistakably shows that public interest is going to be more acute when the matter at issue is controversial. See Bridges, supra at 268. Sexual harassment, and, in this case, its alleged pervasiveness at defendant’s facilities, is a matter of public interest that will engender public discussion.[8] As the Detroit Free Press reported in an October 10, 2001, article, various women complained of sexual harassment at defendant’s Wixom plant, including women who were high-level supervisors. In the article, a manager for the Michigan Department of Civil Rights stated, “ ‘It’s an extraordinary situation when you’ve got that many [sexual harassment complaints].... Filing a lawsuit is not something women take lightly.’ ”
Making this case an even bigger issue of public interest is the manner in which the judicial proceedings are conducted, and the allegation, supportable or not, that participants are not receiving fair treatment in our courts. The public undoubtedly has an interest in ensuring that proceedings are conducted fairly. But punishing comments made while the case is pending will “produce their restrictive results at the precise time *419 when public interest in the matters discussed would naturally be at its height.” Bridges, supra at 268. It is axiomatic that under the majority’s rationale, cases that command the most public interest will be removed from the arena of public discourse. See id. It may take years to resolve a case, and the majority’s position effectively silences negative critiques of the justice system and its parties during that time. Id. With this, I cannot agree.
III. OTHER ADEQUATE AVENUES WERE AVAILABLE TO THE TRIAL COURT
The trial court had numerous other options to use before employing the drastic measure of dismissing plaintiffs case with prejudice. The possibility that other less extreme measures could have been used by the trial court is a weighty factor that must be considered. See, e.g., Landmark Communications, Inc v Virginia, 435 US 829, 843; 98 S Ct 1535; 56 L Ed 2d 1 (1978). The trial court could have required a continuance; moved the location of the trial; continued forward with sequestered, individualized voir dire; or continued forward with voir dire and a larger pool of jurors. See, e.g., Gentile, supra at 1044 (Kennedy, J.). At the very least, the trial court could have issued an order forbidding any future disclosure by the parties of Bennett’s indecent exposure conviction. There is no record that any of these options were seriously considered by the trial court.
The majority appears to argue that plaintiff would not comply with such an order. But plaintiffs sarcastic and posturing comments to defense counsel that she had told people about the conviction and would continue to do so cannot seriously be deemed evidence from which it can be extrapolated that plaintiff would refuse *420 to comply with an order from the court. Notably, it is clear that the trial court never thought it issued an order to any of the parties. The trial court stated:
I don’t believe in gag orders. I’ve never issued a gag order.... I have heard from time to time judges issuing orders personal to the attorneys saying you can’t talk about this case, you can’t do this, you can’t do that. I have never issued such an order in my life.... I haven’t done it in thirty years and I didn’t do it in this case. [Emphasis added.]
Moreover, defendant’s attorney knew that an order was not entered. During a motion hearing, defendant’s attorney reiterated the court’s comment during a prior hearing that “you were not issuing an order. . . .” During the same hearing, Bennett’s attorney also said that he had asked the court to issue an order, but the court had declined. And in any event, whether plaintiff theoretically would comply with such an order is unfounded speculation. The critical fact is that plaintiff is suffering the ultimate punishment for violating an alleged “order” that was never even issued.
To fully understand this case and any comments made by plaintiff, it is important to note that during her deposition, plaintiff endured days of questioning. At one point, her attorneys even filed a motion for a protective order barring further deposition questioning of plaintiff. Plaintiff was questioned about her weight and her Internet habits. Evidence was sought and plaintiff was also questioned about her sexual fantasies, prior sexual assaults, sexual habits, and religious beliefs, as well as her brother’s drug addiction and her father’s criminal past. This case was highly contentious with defense counsel repeatedly claiming that plaintiff was lying so that she could receive a damages award. Plaintiffs statement of defiance to opposing counsel cannot rea *421 sonably be deemed dispositive evidence that she would continue to discuss excluded evidence if ordered not to do so by the court. While I do not condone disrespectful behavior during depositions or during any aspect of a proceeding, plaintiffs response was a human, albeit inadvisable, response in light of the contentious proceedings. But the statement did not rise to such a level that her case should be dismissed with prejudice because she made it, and I vehemently disagree with the majority that doing so was within the range of reasonable and principled outcomes at the trial court’s discretion.
Remarkably, the trial court expressed no real concern about the ability of jurors to impartially decide this case. During a hearing to decide defendant’s motion to dismiss, the trial court stated it was not listening to arguments to determine if the conduct of plaintiff and her attorneys impaired defendant’s right to a fair trial. The trial court stated, “I think it is often possible in high publicity cases to — you know, with appropriate safeguards, to try a case without — it may be difficult sometimes — without the publicity infecting the trial.” Defendant’s attorney agreed that the gravamen of the proceeding was about the “alleged misbehavior” of plaintiff and her attorneys in publicizing material and it was not whether defendant could receive a fair trial.
The majority now wants to portray this case as being about a defendant’s right to a fair trial. See ante at 376. It claims that the “trial court’s limitation on the speech of plaintiff and her counsel was a narrow and necessary limitation aimed at protecting potential jurors from prejudice.” Ante at 377. But I fail to see how necessary it was when the trial court itself did not even consider this as a reason for dismissing the case with prejudice. While the majority now wants to portray this case as *422 being about a defendant’s right to a fair trial because this portrayal better supports the majority’s outcome, I find this depiction to be disingenuous at best because neither the trial court nor defendant itself viewed the case in this way.
IV THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS DID NOT VIOLATE MRPC 3.5 AND MRPC 8.4
The majority states that the trial court did not rely on MRPC 3.5 and MRPC 8.4 in reaching its conclusion to dismiss plaintiffs case. However, the majority nonetheless examines the conduct of plaintiff and her attorneys in light of these rules to provide further evidence that the conduct warranted dismissal of plaintiffs sexual harassment cause of action. MRPC 3.5 states the following:
A lawyer shall not:
(a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law;
(b) communicate ex parte with such a person concerning a pending matter, except as permitted by law; or
(c) engage in undignified or discourteous conduct toward the tribunal.
Regarding MRPC 3.5, the majority refers to a “sarcastic” comment made by one of plaintiffs attorneys to the trial court. Further, the attorney also made a comment during a television interview that it was hard for a plaintiff to get a fair trial when the defendant is a large company like Ford Motor Company. This comment stemmed from plaintiffs filing of an emergency motion for disqualification of the trial judge because, in part, a member of the firm representing defendant who had entered appearances in the matter for defendant was the reception chairperson for a “gala campaign *423 reception” fundraising event for the judge at the Opus One Restaurant in Detroit. After failing to get plaintiffs attorney to disclose who shared the invitation with her and when, the trial judge refused to disqualify himself and then issued an order denying plaintiffs motion to dissolve the order excluding evidence related to Bennett’s 1995 conviction. And later, on August 21, 2002, the trial court dismissed plaintiffs case with prejudice because it claimed that plaintiff and her attorneys had engaged in prejudicial pretrial publicity.
“There is no question that speech critical of the exercise of the State’s power lies at the very center of the First Amendment.” Gentile, supra at 1034 (Kennedy, J.). “Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.” Mills v Alabama, 384 US 214, 218; 86 S Ct 1434; 16 L Ed 2d 484 (1966). This includes “the manner in which government is operated or should be operated, and all such matters relating to political processes.” Id. at 218-219. In Gentile, supra at 1033-1034, the defendant was an attorney who held a press conference that criticized the state for indicting his client and not indicting members of the police department, who he referred to as “crooked cops.” This speech was protected by the First Amendment. Id. at 1058.
People may disagree about whether the comment by plaintiffs attorney about the bias of “Metro Detroit” judges was rude or forthright, crude or candid. The statement could even be deemed unjustifiable. However, it was within the attorney’s constitutional rights to make the statement. “The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of *424 American public opinion.” Bridges, supra at 270. The essence of the right to free speech is that it gives the speaker the opportunity to express the speaker’s viewpoints, valid or not. The citizens of Michigan are intelligent and do not need speech to be sanitized. It does not advance the ideals of the justice system to shelter the public from comments, even those that may be deemed unwarranted by some.
Moreover, there is nothing inherently undignified or discourteous in criticizing a court’s decisions. In fact, a judge should expect these critiques as a “judge must expect to be the subject of constant public scrutiny.” See Code of Judicial Conduct, Canon 2(A). But even if an attorney behaves in a manner that is deemed undignified or discourteous, then sanctions can be imposed against the attorney. Indeed, if every attorney who complained about a court’s ruling had his client’s case dismissed, the dockets of our state’s courts would be cleared almost immediately.
At the outset of its opinion, the majority expresses a concern about “preserving an organized polity....” Ante at 375. And I must note that I do not dispute that it would certainly be easier for a trial court to handle proceedings if there were no fear of criticism for its rulings. However, the ease of a trial court in managing its day-to-day affairs is not sufficient to infringe on plaintiffs First Amendment rights in this case. Our citizens’ constitutional right to free speech does not exist merely when it falls within the majority’s narrowly defined “orderly” parameters. The First Amendment exists to protect speech — discourteous, disorderly, and sometimes downright offensive. “Freedom” is the first and foremost concern protected by the First Amendment, not order. The majority has offered nothing more than conjecture that the actions of plaintiff *425 would impinge on the parties’ right to a fair trial, but the lack of any real concern about a fair trial is particularly obvious when one considers that the trial court itself did not have such a concern. The majority farther ignores that before speech can be punished, it must be determined to have a substantial likelihood of materially prejudicing the proceedings. See MRPC 3.6. Trial court proceedings are not protected by restricting an individual’s right to criticize those very same proceedings.
Regarding MRPC 8.4, the rule states the following:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer;
(c) engage in conduct that is prejudicial to the administration of justice;
(d) state or imply an ability to influence improperly a government agency or official; or
(e) knowingly assist a judge or judicial officer in conduct that is a violation of the Code of Judicial Conduct or other law.
The majority states that plaintiffs counsel did not restrain plaintiff from publicizing Bennett’s indecent exposure conviction and that plaintiffs attorneys participated with plaintiff in this “misconduct” on numerous occasions. The majority refers to MRPC 8.4(a), but I fail to see how plaintiffs attorneys engaged in misconduct through the acts of plaintiff. There is no evidence that plaintiffs attorneys counseled her to speak about Bennett’s indecent exposure conviction. And I disagree that participating in a rally — a time- *426 honored tradition in this country — and speaking to the media constitute “misconduct” that warrants dismissal of plaintiffs case with prejudice.
Finally, the majority states that remanding for an evidentiary hearing about the specifics of the conduct of plaintiff and her attorneys is “no more than a fool’s errand” that it refuses to engage in. Ante at 402. While I disagree that the conduct of plaintiff and her attorneys had a substantial likelihood of materially prejudicing the trial, I fail to see what is foolish about remanding to specifically determine what happened, when, and why. When a person’s First Amendment rights are at stake and the extreme sanction of dismissing a cause of action with prejudice has been ordered, the majority’s steadfast refusal to examine the facts in light of the timetable of events is troubling to say the least.
V CONCLUSION
The First Amendment does not exist merely to protect courteous and genteel speech. The First Amendment “must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.” Bridges, supra at 263. Today, I believe that the majority has ignored the mandates of the Constitution in an ill-advised and unnecessary attempt at maintaining “order” in our courts. I believe that the comments of plaintiff and her attorneys fall well within the parameters of the First Amendment. Accordingly, I respectfully dissent and would affirm the decision of the Court of Appeals.
WEAVER and Kelly, JJ., concurred with Cavanagh, J.

 The United States Constitution provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances. [US Const, Am I.]
The Michigan Constitution provides:
Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press. [Const 1963, art 1, § 5.]

 Notably, Judge Macdonald recognized that this decision may not be final. She stated the following:
My ruling right now is that it [evidence of Bennett’s indecent exposure conviction] will not be allowed even as to notice to Ford Motor. That’s my position now. However, whenever I make a ruling in a vacuum outside the context of a trial, I’m always concerned that when I get in the middle of the trial and I find out I may have made a mistake, I will change my ruling. If I find the probative value of this evidence against only Ford Motor and somehow I can make a limited instruction so that somehow the jury won’t take it as propensity evidence, I would reconsider it. As of right now this evidence is excluded. [Emphasis added.]

 The majority characterizes these remarks as necessary responses to comments made by plaintiff and her attorneys. Ante at 382-383 n 11. The majority believes that saying that plaintiff is a lying opportunist who crafted her story after learning of the indecent exposure conviction is “not intended to taint the potential jury pool and cause prejudice to plaintiff.” Ante at 383 n 11.1, however, believe that an objective reader of the facts of this case will recognize an analytical disparity in the majority’s reasoning. Simply, if mentioning Bennett’s indecent exposure conviction is — as the majority asserts — an attempt to influence the jury pool, then publicly arguing that plaintiff fabricated claims of sexual harassment in a desperate attempt to receive a large cash award from defendant is exactly the same type of conduct that the majority finds so egregious.

 Judge Giovan was assigned to the case after Judge Kathleen Macdonald was assigned to another division of the circuit court.

5 Part of this “one-sided” article states as follows:
Perhaps the plaintiffs are colluding to pick Ford’s pockets. And perhaps Maldonado is the woman Ford portrays her to be — a greedy, sexually wanton, emotionally troubled ringleader of a conspiracy to gouge the company.
Or perhaps she and the other women are telling the truth.

 Plaintiffs counsel later even sought more specificity and argued that the trial court’s request was too vague to provide any guidance because “there’s no way that any member of [plaintiffs] legal team could know when you had drawn a conclusion, as you said, that we were running afoul of the ethical rules

 I also note that after investigating this matter, the state of Michigan’s Attorney Grievance Commission did not find any evidence of misconduct that warranted further action, and it dismissed complaints filed by Bennett’s attorney against plaintiffs attorneys.

 Other women have also alleged sexual harassment involving Daniel Bennett. Notably, this Court has issued two other opinions involving similar allegations against Bennett. See Elezovic v Ford Motor Co, 472 Mich 408; 697 NW2d 851 (2005); McClements v Ford Motor Co, 473 Mich 373; 702 NW2d 166 (2005). Further, a majority of this Court addressed by order another case deeding with alleged sexual harassment by Bennett. Perez v Ford Motor Co No 2, 474 Mich 1057 (2006).